**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 1:21-CR-0236 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| AYINDA HARPER | : | Judge Jennifer P. Wilson |

<u>**MEMORANDUM**</u>

Defendant Ayinda Harper ("Harper") is charged in a one-count indictment with possession of firearms and ammunition by a convicted felon in violation of 18 U.S.C. § 922(g)(1).  (Doc. 1.)  Harper moves to dismiss the single-count indictment based on *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, __ U.S. __, 142 S. Ct. 2111 (2022), and *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023), arguing that Section 922(g)(1) is unconstitutional as applied to him.  (Doc. 50.) For the reasons that follow, the court will grant the motion to dismiss the indictment because the Government has failed to meet its burden under the standard announced in *Bruen* and applied in *Range*.  As applied to Harper, the Government has not established that Section 922(g)(1) is consistent with the Nation's "historical tradition of firearm regulation."

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Harper was charged by indictment on August 18, 2021, with one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1).

1

(Doc. 1.)  He is accused of possessing a loaded firearm on or about September 16, 2020, while knowing that he was previously convicted of a crime punishable by a prison term of more than one year.  (*Id.*)  The prior conviction is not specified in the indictment.  (*Id.*)  However, the Government has indicated that Harper has at least thirteen prior felony and eight misdemeanor convictions, which makes it unlawful for him to possess a firearm or ammunition pursuant to 18 U.S.C. § 922(g)(1).  (Doc. 80, pp. 5–10.)[1]  Harper's adult convictions include multiple armed robberies and drug trafficking convictions.  (*Id.*)

Based on the evidence presented at the suppression hearing in this matter, the court found that Dauphin County probation officers conducted a home visit to Harper's approved state parole address on September 16, 2020.  (Doc. 58, p. 5.) Prior to the home visit, a state employee showed a probation officer one or more photographs posted by Harper on social media of Harper and his girlfriend holding firearms.  (*Id.*)  Upon arriving at the home, the probation officers detained Harper for violating the conditions of supervision based on Harper's admitted use of marijuana and possession of marijuana and drug paraphernalia.  (*Id.*)  After detaining Harper, the probation officers then searched a bag in the residence and found a Beretta pistol inside the bag.  (*Id.* at 6–7.)  Harper was then indicted on one count of illegal possession of the Beretta firearm in violation of Section 922(g)(1).

---

[1] For ease of reference, the court uses the page numbers from the CM/ECF header.

Harper had an initial appearance on August 19, 2021, and was detained pending trial. (Doc. 14.) On September 1, 2022, Harper filed a motion to suppress evidence, which was denied following a hearing. (Docs. 40, 58.) Harper filed a motion for reconsideration from the order denying the motion to suppress, which remains pending. (Doc. 59.)

Harper also filed a motion to dismiss the indictment based on the Supreme Court's decision in *Bruen*, arguing that Section 922(g)(1) is unconstitutional. (Doc. 50.) The court denied Harper's motion to dismiss based on the precedential panel opinion in *Range*, which reaffirmed the constitutionality of Section 922(g)(1) under the history and tradition framework established in *Bruen*, as applied to an appellant whose prohibited status resulted from a conviction for welfare fraud, a non-violent misdemeanor under Pennsylvania law. (Doc. 53.)

Then, on January 17, 2023, Harper filed a motion for reconsideration of the order denying his motion to dismiss the indictment. (Doc. 56.) Harper asserted that reconsideration was warranted because, following the court's denial of his motion, the Third Circuit vacated the panel opinion in *Range*, pending *en banc* review. (*Id.*) The court granted the motion for reconsideration, reinstated Harper's motion to dismiss, Doc. 50, stayed the motion pending the *en banc* decision in *Range*, and directed the parties to file a notice upon issuance of the *en banc* decision in *Range*. (Doc. 57.)

On June 8, 2023, Harper filed a notice advising the court of the June 6, 2023 *en banc* decision in *Range*, and asserting that the decision would have a direct impact on his pending motion to dismiss.  (Doc. 64.)  The court then directed the parties to submit supplemental briefing addressing the *en banc* decision in *Range*.  (Doc. 65.)  The parties filed their supplemental briefs as directed.  (Docs. 66, 80, 81.)  Thus, the motion to dismiss is ripe for disposition.

Harper remains detained pending trial on the sole charge of felon in possession of a firearm and ammunition pursuant to Section 922(g)(1).

## DISCUSSION

### A. Standard of Review

Federal Rule of Criminal Procedure 12 allows parties to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  FED. R. CRIM. P. 12(b)(1).  In his pretrial motion to dismiss, Harper asserts both a facial and as-applied challenge to the constitutionality of Section 922(g)(1).  (*See* Docs. 50, 51, 66, 81.)

In order to resolve an as-applied challenge, the court determines whether a law with some permissible uses "is nonetheless unconstitutional as applied" to the movant's conduct.  *Spence v. Washington*, 418 U.S. 405, 414 (1974).  The standard that applies to a facial challenge is whether a law "could never be applied in a valid manner."  *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466

U.S. 789, 798 (1984).  This standard sets an extremely high bar because the challenger must establish that "no set of circumstances exists under which the Act would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987).  The distinction between facial and as-applied challenges relates to the "breadth of the remedy employed by the court."  *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010).  As relevant here, it is the difference between determining whether Section 922(g)(1) as applied to Harper or as applied to all defendants is constitutional.

Ordinarily, the court must determine first whether the statue is valid as applied before addressing a facial challenge because "for reasons relating both to the proper functioning of courts and to their efficiency, the lawfulness of the particular application of the law should ordinarily be decided first."  *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 485 (1989).  Accordingly, the court will first address the question of whether Section 922(g)(1) is constitutional as applied to Harper.

## B. Pursuant to *Bruen* and *Range*, Section 922(g)(1) is unconstitutional as applied to Harper.

Harper argues that the court should dismiss the Section 922(g)(1) charge of felon in possession of a firearm based on the *en banc* ruling in *Range*, because it applied the holding of *Bruen* to find Section 922(g)(1) unconstitutional as applied to Bryan Range.  (Doc. 66, pp. 3–9.)  Specifically, Harper argues, pursuant to

*Bruen* and *Range*, that he has a Second Amendment right to possess a firearm despite being a convicted felon; Section 922(g)(1) regulates Second Amendment conduct; and that the Government cannot show that Section 922(g)(1) is consistent with the Nation's "historical tradition of firearm regulation." (*Id.*)

The Government first asserts that *Range* is wrongly decided and preserves all arguments in support of that position. (Doc. 80, p. 11 n.7.) The Government then proceeds to argue that *Range* is a narrow decision that is limited to the facts surrounding Range's prior conviction, which are readily distinguishable from Harper's prior convictions. (*Id.* at 11–13.) The Government asserts that the prohibition of firearm possession by a convicted offender such as Harper passes constitutional muster for three separate, independent reasons: "(1) he does not maintain that he possessed the guns for a lawful purpose; (2) he was permissibly barred from possession of a firearm while on state parole; and (3) even assuming *Range* was correctly decided, the bar on firearm possession for a felon such as the defendant is constitutionally permissible based on the historical test outlined in *Bruen*." (*Id.* at 15–16.)

In reply, Harper notes that *Range* is binding precedent for this court, and the Government's disagreement with the holding of *Range* and contrary non-binding authorities are inconsequential. (Doc. 81, p. 3.) Harper asserts that the Government's argument that he must establish that he possessed the firearms for a

lawful purpose "reads a requirement into the *Bruen/Range* analysis that does not exist." (*Id.* at 2.)  Harper also contends that his status as a state parolee is irrelevant under the *Bruen/Range* analysis. (*Id.*at 2–3.)  Harper argues that the Government has not met its burden of establishing that Section 922(g)(1) comports with the Nation's "historical tradition of firearm regulation," given that "the *Range* court rejected the very arguments the Government rehashes here." (*Id.* at 3–6.)  Finally, Harper argues that this court's decision in *United States v. Aqudre Quailes*, __ F. Supp. 3d __, No. 1:21-CR-0176, 2023 WL 5401733 (M.D. Pa. Aug. 22, 2023), finding Section 922(g)(1) unconstitutional as applied to that defendant, is factually indistinguishable even though he has a more extensive criminal history. (*Id.* at 6–7.)

The criminal statute at issue in this case is 18 U.S.C. § 922.  The portion of the statute at issue in this case is Section 922(g)(1), which states: "It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce, any firearm or ammunition . . . ."  There is no dispute that Harper has prior felony convictions that criminalize his possession of a firearm under the statute.  But the question presented is whether it is *constitutional* for the statute to criminalize his firearm possession for life based on his prior convictions.

The court will begin its analysis with the text of the Second Amendment and a brief explanation of the recent, significant developments in Second Amendment precedent from the Supreme Court and the Third Circuit Court of Appeals.  The court will then apply the precedential decisions in *Bruen* and *Range* to the facts and arguments in this case.[2]

### 1. The Text of the Second Amendment and Significant Rulings on the Second Amendment

The text of the Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. CONST. amend. II.

From 1939 to 2008, the Second Amendment was interpreted in accordance with *United States v. Miller*, 307 U.S. 174 (1939).  In *Miller*, the Supreme Court focused on the history and meaning of the word "Militia" in the context of the Second Amendment.  The Court observed that the Constitution, as originally adopted, granted Congress the power "'To provide for calling forth the Militia to execute the Laws of the Union.'"  *Miller*, 307 U.S. at 178 (quoting U.S. CONST. art. 1, § 8).  The Court then held: "With obvious purpose to assure the continuation and render possible the effectiveness of such forces the declaration and guarantee

---

[2] The court notes that it will resolve the motion to dismiss based on the parties' presentations in their briefs.  Neither party has presented an expert report from a historian or requested that the court appoint an expert historian.  Pursuant to the Supreme Court's instruction, the court is "entitled to decide a case based on the historical record compiled by the parties."  *Bruen*, 142 S. Ct. at 1230 n.6.

of the Second Amendment were made.  It must be interpreted and applied with that

end in view." *Id.*  This Militia-based rationale for the Second Amendment held

sway for 70 years.  *See United States v. Bullock*, No. 3:18-CR-165, 2023 WL

4232309, at *6 (S.D. Miss. June 28, 2023) (discussing scholarly articles regarding

*Miller*).

Then, in 2008 and 2010, the Supreme Court decided *District of Columbia v.

Heller*, 554 U.S. 570 (2008), and *McDonald v. Chicago*, 561 U.S. 742 (2010),

resulting in a significant change in our understanding of the Second Amendment.

In those decisions, the Court "recognized that the Second and Fourteenth

Amendments protect the right of an ordinary, law-abiding citizen to possess a

handgun in the home for self-defense." *Bruen*, 142 S. Ct. at 2122 (citing *Heller*,

554 U.S. at 570; *McDonald*, 561 U.S. at 742).  And then, in 2022, the Court held in

*Bruen* "that the Second and Fourteenth Amendments protect an individual's right

to carry a handgun for self-defense outside the home." *Id.*  Following the holdings

of *Heller*, *McDonald*, and *Bruen*, the Nation now understands that the Second

Amendment establishes an individual right to keep and bear arms that does not

depend on service in the militia.

In the years following *Heller* and *McDonald*, "the Courts of Appeals . . .

coalesced around a 'two-step' framework for analyzing Second Amendment

challenges that combines history with means-end scrutiny." *Id.* at 2125.  In *Bruen*,

the Court rejected the two-step framework that had developed, and detailed the

correct standard to be applied to Second Amendment challenges.  *Id.* at 2126–34.

The Court explained that the correct standard is as follows:

> In keeping with *Heller*, we hold that when the Second Amendment's
> plain text covers an individual's conduct, the Constitution
> presumptively protects that conduct.  To justify its regulation, the
> government may not simply posit that the regulation promotes an
> important interest.  Rather, the government must demonstrate that the
> regulation is consistent with this Nation's historical tradition of firearm
> regulation.  Only if a firearm regulation is consistent with this Nation's
> historical tradition may a court conclude that the individual's conduct
> falls outside the Second Amendment's "unqualified command."

*Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961)).

The Court provided some guidance as to how courts are to assess whether a

modern firearm regulation is consistent with historical tradition.  The Court

observed first that when analyzing a modern firearm regulation that addresses a

"general societal problem that has persisted since the 18th century":

> [T]he lack of a distinctly similar historical regulation addressing that
> problem is relevant evidence that the challenged regulation is
> inconsistent with the Second Amendment.  Likewise, if earlier
> generations addressed the societal problem, but did so through
> materially different means, that also could be evidence that a modern
> regulation is unconstitutional.  And if some jurisdictions actually
> attempted to enact analogous regulations during this timeframe, but
> those proposals were rejected on constitutional grounds, that rejection
> surely would provide some probative evidence of unconstitutionality.

*Id.* at 2131.  On the other hand, when analyzing a modern firearm regulation that

was "unimaginable" during the founding era, the Court instructs:

> [T]his historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar."

*Id.* at 2132 (citation omitted). In order to ascertain whether regulations are "relevantly similar," the Court notes that "*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. The Court explains that the burden on the Government is to identify a "well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

### 2. The Third Circuit Applies *Bruen* in *Range*

Nearly one year after *Bruen* was decided, the Third Circuit issued an *en banc* decision in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023). The majority opinion, authored by Judge Hardiman and joined by eight judges, holds that Bryan Range remains among "the people" protected by the Second Amendment despite his false statement conviction, and "because the Government did not carry its burden of showing that our Nation's history and tradition of

firearm regulation support disarming Range," Section 922(g)(1) violates the

Second Amendment as applied to Range.[3]  *Id.* at 98.

    The *Range* decision arises from a civil suit rather than a criminal

prosecution.  In 1995, Bryan Range pleaded guilty in the Court of Common Pleas

of Lancaster County to one count of making a false statement to obtain food

stamps in violation of Pennsylvania law.  He was sentenced to three years'

probation, and ordered to pay restitution, costs, and a fine.  When Range pleaded

guilty, his conviction was classified as a misdemeanor punishable by up to five

years' imprisonment.  That felony-equivalent conviction precludes Range from

possessing a firearm pursuant to 18 U.S.C. § 922(g)(1).  After Range learned that

he was barred from possessing a firearm because of his 1995 conviction, he filed a

---

[3] Only one other Circuit Court of Appeals has applied the *Bruen* standard to Section 922(g)(1). On June 2, 2023, the Eighth Circuit Court of Appeals held that Section 922(g)(1) was constitutional as applied to the defendant based on his particular felony convictions. *United States v. Jackson*, 69 F.4th 495, 501 (8th Cir. 2023).  In *United States v. Jackson*, the Court relied upon the "assurances" in *Heller*, *McDonald*, and *Bruen* stating that the holdings in those cases do not cast doubt on "longstanding prohibitions on the possession of firearms by felons" and the history that supports those assurances, to conclude that "there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)."  69 F.4th at 501–06.

The Fifth Circuit Court of Appeals has determined that Section 922(g)(8), which criminalizes the possession of firearms for a person subject to a domestic violence restraining order, fails the history and tradition test in *Bruen* and thus violates the Second Amendment. *United States v. Rahimi*, 61 F.4th 443, 448 (5th Cir. 2023) (granting a facial challenge to the section of the statue).  The Supreme Court granted certiorari in this case on June 30, 2023. *United States v. Rahimi*, 143 S. Ct. 2688 (2023).  In addition, the Fifth Circuit Court of Appeals granted a defendant's as-applied challenge to Section 922(g)(3), which criminalizes the possession of a firearm for unlawful users of a controlled substance, because that section, too, failed the history and tradition standard in *Bruen*. *United States v. Daniels*, __ F.4th __, No. 22-60596, 2023 WL 5091317 (5th Cir. Aug. 9, 2023).

civil action seeking a declaration that Section 922(g)(1) violates the Second Amendment as applied to him and an injunction prohibiting the law's enforcement against him.  *Range*, 69 F.4th at 98–99.

The parties filed cross motions for summary judgment.  The district court granted the Government's motion, applying then-controlling Third Circuit precedent.  *Id.* at 99 (noting that the district court relied upon *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), *Binderup v. Att'y Gen.*, 836 F.3d 336 (3d Cir. 2016), *Holloway v. Att'y Gen.*, 948 F.3d 164 (3d Cir. 2020), and *Folajtar v. Att'y Gen.*, 980 F.3d 897 (3d Cir. 2020)).  Range appealed, and while his appeal was pending, the Supreme Court decided *Bruen*.  The panel hearing Range's appeal affirmed the district court's grant of summary judgment in the Government's favor, holding that the Government had met its burden to show that § 922(g)(1) reflects the Nation's historical tradition of firearm regulation such that Range's conviction "places him outside the class of people traditionally entitled to Second Amendment rights."  *Range*, 53 F.4th at 266.  Range then petitioned for rehearing *en banc*, the court granted the petition, and vacated the panel opinion. *Range v. Att'y Gen.*, 56 F.4th 992 (3d Cir. 2022).

The *en banc* majority opinion concludes by clarifying that the decision is "a narrow one" deciding the constitutionality of Section 922(g)(1) only as applied to

Bryan Range based on his prior felony-equivalent false statement conviction.[4] *Range*, 69 F.4th at 106.  Because *Range* is binding precedent applying *Bruen* in the context of an as-applied challenge to Section 922(g)(1)—the same criminal statute at issue in this case—it is important to understand the court's analysis and rationale.

Applying *Bruen*, the court explained that the first part of the analysis is to decide whether the text of the Second Amendment applies to the person and his proposed conduct.  As noted by the court, this determination is significant, because if the Second Amendment applies to the person and proposed conduct, then the Government bears the burden of proving that the firearms regulation at issue "'is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'"  *Range*, 69 F.4th at 101 (quoting *Bruen*, 142 S. Ct. at 2127).

On the first question, the court determined that Range remains one of "the people" despite his prior conviction.  *Id*. at 101–03.  The court reached this

---

[4] Judge Ambro authored a concurring opinion to separately make the point that the success of Range's as-applied challenge "does not spell doom for § 922(g)(1)."  *Range*, 69 F.4th at 109. Judge Ambro observes that Section 922(g)(1) "remains 'presumptively lawful'" because "it fits within our Nation's history and tradition of disarming those persons who legislatures believed would, if armed, pose a threat to the orderly functioning of society."  *Id.* at 110.  Judge Ambro's review of historical analogues leads him to conclude that there is, in general, a historical tradition of stripping firearms from those who cannot be trusted with them because they pose a threat to the orderly functioning of society.  *Id.* at 111–12.  Ultimately, he concurs with the majority opinion because presumptions can be rebutted, and the Government did not carry its burden of proving that Range poses a threat to the orderly functioning of society.  Accordingly, in his view, Range may not be constitutionally disarmed based on the record presented.  *Id.* at 112.

conclusion for four reasons, none of which depended on the specifics of Range's conviction.  First, the court noted that because the criminal histories of the plaintiffs in *Heller*, *McDonald*, and *Bruen* were not at issue, the Supreme Court's references to "law-abiding, responsible citizens" were dicta that should not be construed too broadly.  *Id.* at 101.  Second, the court observed that other constitutional provisions, including the First and Fourth Amendments, also reference "the people," and the meaning of "the people" should not vary across provisions.  *Id.* at 101–02.  Third, the court agreed with the statement in *Binderup* and the logic of then-Judge Barrett in her dissenting opinion in *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019), that persons with Second Amendment rights may nonetheless be denied possession of a firearm.  Finally, the court noted that the phrase "law-abiding, responsible citizens" is too expansive and vague to constitute a workable standard and would, in any event, give far too much authority to legislatures to decide whom to exclude from "the people."  *Id.* at 102–03.

Next, the court addressed the "easy question" of whether the Second Amendment applied to the proposed conduct.  The court held that Section 922(g)(1) regulates Second Amendment conduct because Range's request to possess a rifle to hunt and a shotgun to defend himself at home are plainly within the constitutional right as defined by *Heller*.  As a result, "the Constitution

presumptively protects that conduct." *Id.* at 103 (quoting *Bruen*, 142 S. Ct. at 2126).

Finally, the court addressed the question of whether "the Government ha[d] justified applying Section 922(g)(1) to Range 'by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'" *Id.* (quoting *Bruen*, 142 S. Ct. at 2130.)  The court held that the Government did not carry its burden.  *Id.*  The court addressed five discrete arguments presented by the Government, but found that none satisfied the Government's burden.  *Id.* at 103–06.  Ultimately, the court determined that "[b]ecause the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms, § 922(g)(1) cannot constitutionally strip him of his Second Amendment rights."[5]  *Id.* at 106.

### 3.  Application of the *Bruen* and *Range* Analytical Framework to This Case

The analytical framework for addressing the as-applied constitutional challenge to Section 922(g)(1) is established in *Range*, which applies the standard

---

[5] In *United States v. Bullock*, No. 3:18-CR-165, 2023 WL 4232309 (S.D. Miss. June 28, 2023), the district court reached the same conclusion with respect to the defendant, who had a prior conviction for aggravated assault and manslaughter.  After a detailed and thorough analysis of Second Amendment precedent and the arguments presented by the parties, the court determined that the Section 922(g)(1) charge must be dismissed because the Government failed to carry its burden of establishing that a historical tradition supports a lifetime criminalization of the defendant's possession of a firearm.  *Id.* at *6–31.

set forth in *Bruen*.  *Range*, 69 F.4th at 101.  The court will apply this framework to the facts and arguments presented in this case.

As a preliminary matter, the Government asserts that *Range* is wrongly decided and distinguishable from the facts of this case.  (Doc. 80, pp. 11–13, 11 n.7.)  The court will not address the argument that *Range* is wrongly decided because the Government has merely included that argument to preserve it for appellate review.  (*See id.*)  The Government distinguishes *Range* based on the fact that Bryan Range had a "single decades-old conviction for making a false statement to obtain food stamps," whereas Harper sustained multiple convictions for robberies and drug trafficking, and he committed the instant offense while on probation/parole.  (*Id.* at 12.)  The court agrees with the Government that Harper is "manifestly not like Range" based on a comparison of their prior convictions.  The court further agrees that this is a meaningful distinction between the *Range* decision and the facts of this case that bears discussion, as detailed in the following sections.  However, it is not sufficient to simply distinguish the facts of the cases because that does not answer the question of whether the criminalization of firearm possession by Harper is constitutional.  In order to make that determination, the court must conduct the analysis required by *Bruen* and *Range*.[6]

---

[6] In *United States v. Law*, No. 20-341, 2023 WL 5176297 (W.D. Pa. Aug. 11, 2023), the district court denied the defendant's motion for reconsideration of his motion to dismiss a Section 922(g) charge based on *Range*, because the defendant failed to raise a meaningful as-applied challenge

### i.  Harper, as a convicted felon, has Second Amendment rights.

The threshold question that must be addressed is whether Harper is one of "the people" protected by the Second Amendment despite having prior felony convictions.  *Range*, 69 F.4th at 101.  Harper asserts that he remains among "the people" for Second Amendment purposes, and the Government does not disagree. (Doc. 66, pp. 3–5; Doc. 80, p. 15.)

The Third Circuit determined that Bryan Range was among "the people"— despite his prior felony-equivalent conviction—for four reasons.  *Range*, 69 F.4th at 101–03.  Those four reasons do not depend to any extent on the nature of Range's prior conviction.  Accordingly, the fact that Harper has multiple felony robbery and drug trafficking convictions instead of Range's single false statement conviction is a distinction, but it does not warrant a different conclusion as to the threshold question of whether Harper is one of "the people" protected by the Second Amendment.  He is.

---

to the statute and the predicate crime in *Range* was distinguishable from the defendant's predicate offense and other disqualifying circumstance of firearm possession while under a criminal justice sentence.  In the *Law* case, the district court denied the motion for reconsideration and did not consider the merits of the motion to dismiss, whereas this court has granted Harper's motion to reconsider and is addressing the merits of the constitutional challenge.  Thus, it is not sufficient in this case to merely note that the disqualifying predicate offense in *Range* is distinguishable from the predicate offense in this case.

### ii.  Section 922(g)(1) regulates Second Amendment conduct.

After determining that Range was one of "the people," the court turned to

the "easy question" of whether Section 922(g)(1) regulates Second Amendment

conduct.  *Range*, 69 F.4th at 103.  The court held that Section 922(g)(1) does

regulate Second Amendment conduct because "Range's request —to possess a

rifle to hunt and a shotgun to defend himself at home—tracks the constitutional

right as defined by *Heller*."  *Id.* (quoting *Heller*, 554 U.S. at 582 ("[T]he Second

Amendment extends, prima facie, to all instruments that constitute bearable arms,

even those that were not in existence at the time of the founding.")  In *Bruen*, the

Supreme Court held that when the Second Amendment's plain text covers an

individual's conduct, the Constitution presumptively protects that conduct.  *Bruen*,

142 S. Ct. at 2126.  Applying this standard to the facts in *Bruen*, the Court found

the test easily satisfied because the plain text of the Second Amendment protects

the plaintiffs' proposed course of conduct of carrying handguns in public.  *Id.* at

2134–35.

In *Bruen* and *Range*, the plaintiffs' proposed conduct was readily apparent

because they filed lawsuits to allow them to engage in the conduct at issue.  In a

criminal case, a different approach is required.  Harper asserts that the indictment

charges him with possession of a handgun, and that Heller describes handguns as

the "quintessential self-defense weapon . . . and a complete prohibition of their use

19

is invalid." (Doc. 66, pp. 3–4 (quoting *Heller*, 554 U.S. at 629).) Harper further asserts that handguns fall within the meaning of "arms" for Second Amendment purposes, and that the possession of a handgun as alleged in the indictment clearly qualifies as "keeping and bearing arms." (*Id.* at 4.)

The Government argues first that Harper's challenge fails at this step in the analysis because: the Supreme Court has made clear that "the core purpose of the Second Amendment is to protect the right to maintain arms to use in self-defense;" "the government may disarm a person who possesses a firearm for an illegal purpose;" and Harper has not argued that he had a lawful reason for possessing the firearm." (Doc. 80, pp. 16–18.) In reply, Harper asserts that the Government's argument that he must affirmatively establish that he possessed the firearm for a lawful purpose "reads a requirement into the *Bruen/Range* analysis that does not exist." (Doc. 81, p. 2.)

The crux of the Section 922(g)(1) charge is that the mere possession of a firearm is a criminal act due to the defendant's status as a convicted felon. Other than to address a Second Amendment challenge, there is no reason to require a defendant accused of illegal possession of a firearm pursuant to Section 922(g) to state his purpose for possessing the firearm. That is because the circumstances surrounding the possession do not impact the elements of the offense. In other words, even if Harper asserted that he possessed the firearm for the purpose of self-

defense, he would still stand accused of violating Section 922(g)(1) because the possession of a firearm for any purpose is a criminal act based on his status as a convicted felon.  Thus, even assuming the defendant could make a representation about his purpose in possessing a firearm without that representation being deemed an admission, the purpose for making such a representation is limited to this Second Amendment context.  It is not clear that the *Bruen* or *Range* decisions would require an assertion of purpose in the criminal context.  Thus, this court will not require this assertion of purpose without clear direction from the Third Circuit or the Supreme Court.

Rather, as suggested by Harper, the court will accept the conduct alleged in the indictment as true for purposes of making this determination.  Harper's possession of a firearm is conduct covered by the plain text of the Second Amendment: "[T]he right of the people to keep and bear Arms, shall not be infringed."  *See Bullock*, 2023 WL 4232309 at *28 (holding that the plain text of the Second Amendment covers Mr. Bullock's conduct, which was "possession of ordinary firearms in the home").

The Government makes a second argument about why the Second Amendment did not apply to Range at the time of the offense—that is, because he was on state parole at the time, and his possession of loaded firearms violated the terms of his parole.  (Doc. 80, pp. 18–19.)  Harper replies that his status as a state

parolee is irrelevant and unconnected to the analysis under *Bruen/Range*.  (Doc. 81, pp. 2–3.)

Although the Government's point is a bit opaque, the court construes this as a similar argument to the first: because Harper did not lawfully possess the firearms because he was on probation/parole, his conduct in possessing them is not entitled to Second Amendment protection.  This argument puts the cart before the horse.  That Harper may lawfully be stripped of a firearm does not prove that he did not have a Second Amendment right to possess the firearm to begin with.  *See Range*, 69 F.4th at 102 (citing *Binderup*, 836 F.3d at 344; *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting)).  In other words, the fact that Harper may have violated the conditions of his state parole by possessing the firearm—as well as allegedly violating federal law by possessing the firearm due to his status as a convicted felon—does not answer the question of whether his conduct of possessing the firearm is covered by the Second Amendment.

The Government cites *United States v. Shaw*, No. 22-1, 2023 WL 3619416 (D.D.C. May 24, 2023), for the proposition that "the Second Amendment protection did not apply to [Harper] at the time of the offense charged here" because he was on probation or parole.  (Doc. 80, p. 19.)  In *Shaw*, the question was whether a gun restriction during a twenty-four-month period of probation was warranted and consistent with the Second Amendment.  The court made no

determination of whether the defendant had a Second Amendment right to possess a firearm while on supervision, but simply determined whether the right could be temporarily suspended during a period of supervision.  The court specifically stated the issue was *not* whether misdemeanants in general have a Second Amendment right to possess firearms.  *Shaw*, 2023 WL 3619416 at *4.  In *Shaw*, the court expressly did not address the question presented in this case, explaining:

> The Court emphasizes that its holding is only that any Second Amendment right applicable here may be limited during the period of probation, just as other myriad constitutional rights are.  The question of whether that Amendment would tolerate a law barring people who have committed misdemeanors from possessing firearms after the completion of their sentence is not before the Court, and that could well require the type of historical analysis that the Supreme Court contemplated in *Bruen*.  Here, however, the analytic posture is very different.  This case does not challenge a gun law; it challenges a probation condition . . . . The Court's analysis is accordingly limited to the validity of that probation condition, which it here approves.

*Id.* at *7.  The *Shaw* decision does not support the Government's position for the additional reason that the court relied on the same "law-abiding citizens" language from *Bruen*, *Heller*, and *McDonald* that the court in *Range* found to be dicta that should not be overread.  69 F.4th at 101.

For the reasons already explained, Harper's possession of a firearm is conduct covered by the plain text of the Second Amendment.  As a result, "the Constitution presumptively protects that conduct."  *Bruen*, 142 S. Ct. at 2126.

23

### iii. The Government has not met its burden of establishing that Section 922(g)(1) is consistent with the Nation's "historical tradition of firearm regulation" as applied in this case.

Having determined that Harper and his conduct are protected by the Second Amendment, the court must determine whether the Government can constitutionally "strip him of his right to keep and bear arms." *Range*, 69 F.4th at 103.  In order to make this determination, the court must decide whether the Government can justify the criminalization of firearm possession by Harper "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130; *see also Range*, 69 F.4th at 103.

In *Bruen*, the Supreme Court provided some guidance as to the method courts should employ to make this determination.  The court should first assess whether the challenged firearm regulation addresses a "general societal problem that has persisted since the 18th century" or a problem that was "unimaginable at the founding." *Bruen*, 142 S. Ct. at 2131–32; *see also Range*, 69 F.4th at 103.  On this issue, Harper asserts—without any supporting authority—that "felons' access to guns" is a "general societal problem that has persisted since the 18th century." (Doc. 66, p. 5.)  In support of this assertion, Harper simply contends that "the

24

potential danger posed by felons' access to firearms would hardly have been foreign to the Founders."[7]  (*Id.*)

Although the Government does not expressly state that it views Section 922(g)(1) as a regulation intended to address a societal problem that was "unimaginable at the founding," it implicitly takes this position by arguing on the basis of historical analogs that are, in the Government's view, relevantly similar. (Doc. 80, pp. 20–27.)  This is the methodology that is applicable to a challenged regulation addressing a modern problem. *Bruen*, 142 S. Ct. at 2132.

In order to analyze Section 922(g)(1) under this framework, the court must determine whether a historical regulation is a proper analogue for Section 922(g)(1), which requires a determination of whether the two regulations are "relevantly similar." *Bruen*, 142 S. Ct. at 2132.  In order to ascertain whether regulations are "relevantly similar," the Court notes that "*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133.  The Court explains that the burden on the Government is to identify a "well-established and representative

---

[7] The Government does not respond to Harper's argument that felons possessing firearms have been a problem since the Nation's founding.  When analyzing a "general societal problem," the "lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.  Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Bruen*, 142 S. Ct. at 2131. Inasmuch as the Government has not responded to this argument to any extent, it has failed to satisfy its burden as to this analysis as well as on the "historical analogue" analysis.

historical *analogue*, not a historical *twin*.  So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."  *Id.*

Under this framework, the court must first specify what exactly the Government must establish by analogical reasoning.  Is it the Government's burden to establish a historical analogue for Section 922(g)(1)'s criminalization of firearm possession by a person convicted of any felony or felony-equivalent offense?  Or, given that this is an as-applied challenge, and Harper's predicate convictions are for drug trafficking and robbery offenses, must the Government establish a historical analogue for criminalization of firearm possession by a person convicted of a felony drug trafficking or robbery offense?  The Government takes the position that the issue should be framed slightly differently, asserting: "There is clear historical support for restricting the possession of firearms by persons who, like the defendant, previously committed dangerous felonies."  (Doc. 80, p. 20.)

In *Range*, the court stated several times that it was determining whether the historical firearms regulations cited by the Government were analogous to "Range's situation" or "someone like Range."  *Range*, 69 F.4th at 104 n.9, 105.  Although the court does not explain precisely what aspect of Range's "situation" is most relevant or what metric should be used to determine whether someone is "like Range," the court specifically observes that one founding era law was not a

relevant historical analogue because Range's prior offense of making a false statement on a food stamp application did not involve the same conduct as the purported historical analogue. *Id.* at 105. In addition, the conclusion of the majority opinion states: "Bryan Range challenged the constitutionality of 18 U.S.C. § 922(g)(1) only as applied to him given his violation of 62 Pa. Stat. Ann. § 481(a). . . . Because the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms, § 922(g)(1) cannot constitutionally strip him of his Second Amendment rights." *Id.* at 106. Based on a careful review of the history and tradition analysis in *Range*, the court concludes that the more specific formulation of the question presented is the correct one.

So, then, the court will examine the historical analogues identified by the Government in this case to determine whether the Government has met its burden to establish a historical analogue for criminalization of firearm possession by a person who, like Harper, has been convicted of a felony drug trafficking or robbery offense.

First, the Government points to the language in *Heller*, which was repeated in Justice Alito and Justice Kavanaugh's concurring opinions in *Bruen*, that the decisions do not cast doubt on "longstanding prohibitions on the possession of firearms by felons." (Doc. 80, pp. 20–21 (citations omitted).) The very same

argument was rejected in *Range* because the 1961 version of Section 922(g)(1) does not qualify as a "longstanding" regulation "for purposes of demarcating the scope of a constitutional right." *Range*, 69 F.4th at 104.[8]  Based on the holding in *Range* that "the 1961 iteration of § 922(g)(1) does not satisfy the Government's burden," the court reaches the same conclusion here.  *Id.*

In *United States v. Bullock*, the district court declined to rely on the language from *Heller*, *McDonald*, and *Bruen* about "longstanding prohibitions on the possession of firearms by felons" because it was dicta that amounted to an advisory opinion.  2023 WL 4232309 at *17–19 (citations omitted).  Similarly, in *Range*, the court rejected the argument that the Supreme Court's references to "law-abiding citizens" in *Heller* was controlling with respect to the issue of whether Range is among "the people" despite his prior conviction because the references to "law-abiding responsible citizens" were dicta which should not be "overread" for multiple reasons.  *Range*, 69 F.4th at 101–03.  The court also noted that the *Heller*, *McDonald*, and *Bruen* Courts did not actually cite any "longstanding prohibitions" because they did not undertake an exhaustive historical analysis of the scope of the Second Amendment.  *Id.* at 103 n.7.  Thus, the "longstanding prohibition"

---

[8] The court noted that the earliest version of the statute, the Federal Firearms Act of 1938, applied only to violent criminals.  *Range*, 69 F.4th at 104.  The Government has not argued in this case that the 1938 version of the law would have applied to Harper.  But, even if that argument were raised, the court in *Range* expressed skepticism about whether the 1938 version of the statute would be considered "longstanding" "given the *Bruen* Court's emphasis on Founding- and Reconstruction-era sources.  *Id.*

28

language in *Heller*, *McDonald*, and *Bruen* does not satisfy the Government's

burden for the additional reason that it is dicta that this court will not construe to

resolve the constitutional issue in this case.[9]

Following the argument that the Supreme Court's "longstanding prohibition

language" is controlling, the Government makes no effort to identify a historical

analogue that involves the criminalization of firearm possession for those

convicted of drug trafficking offenses (or any kind of drug-related or trafficking-

related offense for that matter) or robbery offenses.  Instead, the Government

argues that historical analogs, including 17th century English law, colonial laws,

post-ratification state laws, and Reconstruction-era state laws, empowered

government officials to disarm those who were deemed dangerous, irresponsible,

or unlikely to abide by the law.[10]  (Doc. 80, pp. 22–26.)  The Government contends

---

[9] In a footnote, the Government argues that the holding in *United States v. Barton*, 633 F.3d 168, 171–72 (3d Cir. 2011)—that the list in *Heller* of presumptively lawful regulations, including Section 922(g)(1), is not dicta—remains binding precedent on this point today.  (Doc. 80, p. 21 n.12.)  It is not at all clear that *Barton* is binding precedent on this issue given that it was overruled, at least in part, by *Binderup v. Attorney General*, 836 F.3d 336, 349 (3d Cir. 2016). The holding is also in tension with the *en banc* ruling in *Range* that the "law-abiding citizens" and "long-standing prohibitions" language in *Heller*, *McDonald*, and *Bruen* is not controlling. 69 F.4th at 101, 104.

[10] The Government also points to precursors to the Second Amendment proposed in the state ratifying conventions in Pennsylvania and Massachusetts.  (Doc. 80, p. 24.)  In each proposal, it was suggested that those who presented a "danger of public injury" or were not "peaceable citizens" would not have a right to keep and bear arms.  (*Id.*)  The Government does not meet its burden with this historical evidence because the proposed precursors to the Second Amendment did not become law and the import of that fact is difficult to discern.  In addition, it is not clear that proposals made during two ratifying conventions is sufficient evidence to establish a historical tradition.  *See Bullock*, 2023 WL 4232309 at *22–23; *see also Kanter*, 919 F.3d at 456 (Barrett, J., dissenting).

that these historical analogs are relevantly similar to the criminalization of

Harper's possession of a firearm because his prior drug trafficking and robbery

convictions demonstrate that he poses a danger to society.  (*Id.* at 28–29.)  The

Government distinguishes the Third Circuit's analysis of the suggested analogs in

*Range* on the ground that Range's prior conviction did not pose a danger to

society.  (*Id.* at 27–28.)

　　　In the absence of any close historical analogue, the court is tasked with

determining whether a historical regulation is "relevantly similar" to the modern

regulation.  Here, the Government is asserting that historical disarmament of those

deemed dangerous is sufficiently similar to disarming a convicted drug trafficker

and robber such as Harper to satisfy its burden.  In *Range*, the court considered the

argument presented by Bryan Range that "dangerousness" should be the

touchstone for the "historical tradition" analysis.  *Range*, 69 F.4th at 104 n.9

(noting that the argument rested upon a concurring opinion in *Binderup*, 836 F.3d

at 369, Judge Bibas' dissent in *Folajtar*, 980 F.3d at 913–20, and then Judge-

Barrett's dissent in *Kanter*, 919 F.3d at 454).  The court noted that the Government

replied to the argument by asserting that "10 of the 15 judges in *Binderup* and the

Court in *Holloway* and *Folajtar* rejected dangerousness or violence as the

touchstone."[11]  *Id.*  The court then stated that it would not resolve that dispute because "the Government did not carry its burden to provide a historical analogue to permanently disarm someone like Range, whether grounded in dangerousness or not."  *Id.*

In order to determine whether the historical disarmament of those deemed dangerous is "relevantly similar" to disarming a convicted drug trafficker and armed robber such as Harper, the court is instructed to look at the two metrics of "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Bruen*, 142 S. Ct. at 2133.  The Government has not presented any argument comparing the "how and why" of the historical "dangerousness" regulations with the "how and why" of Section 922(g)(1).  Instead, the Government has merely catalogued historical regulations that disarmed individuals who posed a risk of dangerousness to varying extents.  In one of the earlier regulations, entire groups were disarmed, whereas another law called for case-by-case judgments.  (Doc. 80, pp. 12–23.)  The Government cited another historical law that disarmed individuals who demonstrated their dangerousness by engaging in particular types of conduct, such as carrying arms in a manner that spreads fear or terror among the people.  (*Id.* at 23.)  The Government pointed to the fact that,

---

[11] It is interesting to note that the Government argued in *Range* that dangerousness is not the touchstone for the historical analysis, whereas it asserts the opposite here.

in the mid-19[th] century, many states enacted laws requiring "those threatening to do harm" to post a bond before they would be permitted to carry weapons in public.  (*Id.* at 25.)  Then, the Government pointed to a Reconstruction-era regulation in South Carolina that disarmed "disorderly person[s], vagrant[s], [and] disturber[s] of the peace.  (*Id.* at 25.)

Even assuming that the examples of the historical regulations are sufficiently relevant and numerous to establish a historical *tradition* of disarming the dangerous, the Government did not explain to any extent the "how" of each regulation—such as the length of time the individuals were disarmed; whether a conviction was required or any other information about how the dangerousness determination was made; or what kind of offenses qualified as dangerous.  The Government also did not present any argument as to the "why" or purpose of the historical regulations.  Because the Government has not provided the court with a basis to determine whether the mechanics and purpose of the historical regulations disarming those deemed "dangerous" are similar to the mechanics and purpose of Section 922(g)(1), the Government has not carried its burden to establish that the historical regulations are "relevantly similar."

Although the Government did not explain the "how" or "why" of the cited historical regulations or compare the mechanics or purpose of those regulations to Section 922(g)(1), the Government does argue generally that Harper's prior

convictions demonstrate that he poses a danger to society.  (Doc. 80, pp. 28–29.)
The Government cites multiple authorities for the proposition that firearms are
frequently used in connection with drug trafficking, which poses a danger to
society.  (*Id.*)  The Government then concludes—without the kind of explanation
required by *Bruen*—that "barring Defendant's future possession of firearms by is
squarely 'part of the historical tradition that delimits the outer bounds of the right
to keep and bear arms.'"  (*Id.* at 29 (quoting *Bruen*, 142 S. Ct. at 2127).)  The
Government's conclusion rests on dangerousness as the historical "touchstone"
without any explanation of how the earlier regulations compare in mechanics or
purpose to Section 922(g)(1).  This comparison is too broad and does not carry the
Government's burden under the *Bruen/Range* standard.  *See Bruen*, 142 S. Ct. at
2138 (finding that the historical record compiled by respondents did not
demonstrate a tradition of prohibiting the public carrying of commonly used
firearms for self-defense); *Range*, 69 F.4th at 105 (finding that the Government did
not successfully analogize historical status-based restrictions to disarm certain
groups of people to Range and his individual circumstances and any such analogy
would be far too broad).[12]

---

[12] In *United States v. O'Connor*, No. 03-134, 2023 WL 5542087, at *3 (W.D. Pa. Aug. 29,
2023), the court stated that "the majority opinion in *Range* recognized that [Section 922(g)(1)] is
constitutional when applied to violent felons."  This court does not agree with that interpretation
of *Range* based, in part, on a review of footnotes 7 and 9 in *Range*.

Finally, if "dangerousness" is found to be the touchstone of the historical analogue analysis, then the court has concerns about the application of that standard.  If the Government's argument that our Nation has a historical tradition of disarming those who pose a danger to society is accepted (which this court has not), then it seems apparent that criminalizing Harper's possession of a firearm is consistent with that tradition based on his prior drug trafficking offense that involved a firearm and five armed robbery convictions.  (Doc. 80, pp. 6–8.) However, the application of a "dangerousness" standard will not always be so straightforward.  What about those who launder money in order to conceal the proceeds of drug trafficking, or those who aid and abet an armed robbery but are not directly involved in the armed robbery?  Assuming it is ultimately concluded that drug trafficking and armed robbery are "dangerous" crimes for purposes of Second Amendment analysis, are these other offenses also consistent with the tradition of disarming those who pose a danger to society?

Of course, these other offenses are not at issue in this case, but the court poses these questions because the potential application of a "dangerousness" standard will necessarily lead to this kind of case-by-case analysis that will involve consideration of the elements of the predicate offenses and possibly even the facts underlying those offenses in a manner that would resemble the categorical and modified categorical approaches to determine whether a defendant's prior

conviction is a "violent felony" for purposes of the Armed Career Criminal Act. *See Bullock*, 2023 WL 4232309 at *27 (noting a similar concern and compiling criticism of these analytical approaches).  Moreover, in order for "dangerousness" to be the standard for judging modern firearm regulations, then a clear definition will need to be determined in order to avoid endless challenges and uncertainty in applying a standard which has obvious interpretive complexity.  *See Range*, 69 F.4th at 102–03 (noting that the phrase "law-abiding, responsible citizens" is too expansive and vague to constitute a workable standard and would give far too much authority to legislatures to decide whom to exclude from "the people").  These considerations, though not the basis for granting Harper's motion to dismiss, warrant further consideration as courts continue to assess the constitutionality of Section 922(g)(1).

### C. The court will not determine whether Section 922(g)(1) is facially unconstitutional.

Harper asserts both a facial and as-applied challenge to the constitutionality of Section 922(g)(1).  (*See* Docs. 50, 51, 66, 81.)  It is incumbent on the court to determine first whether the statue is valid as applied before addressing a facial challenge because "for reasons relating both to the proper functioning of courts and to their efficiency, the lawfulness of the particular application of the law should ordinarily be decided first."  *Bd. of Trustees of State Univ. of N.Y.*, 492 U.S. at 485.

Having determined that Section 922(g)(1) is unconstitutional as applied to Harper, the court will not proceed to resolve the facial challenge.

### CONCLUSION

For the foregoing reasons, Harper's motion to dismiss the indictment will be granted.  An implementing order will follow.

<u>s/Jennifer P. Wilson</u>
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: September 1, 2023