## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 1:21-CR-0236 |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| AYINDA HARPER | : | Judge Jennifer P. Wilson |

### MEMORANDUM

Before the court are motions for reconsideration and to dismiss filed by Defendant Ayinda Harper ("Harper").  (Docs. 59, 116.)  The court finds that Harper has not raised an appropriate issue for reconsideration, however, the court interprets the arguments regarding suppression of evidence as if a new motion to suppress was filed.  The court further holds that 18 U.S.C. § 922(g)(1) is constitutional as applied to Harper.  Thus, for the reasons that follow, the motion for reconsideration will be denied, the new motion to suppress will be denied with leave to file another motion regarding the *Miranda* issue only, and the motion to dismiss will be denied.

### PROCEDURAL HISTORY

On August 18, 2021, the United States filed a one-count indictment against Harper for possession of a firearm by a prohibited person in violation of 18 U.S.C. §§ 922(g)(1) and 924(e).  (Doc. 1.)  On September 1, 2022, Harper filed a motion to suppress evidence.  (Doc. 40.)  Harper also filed a motion to dismiss the

1

indictment on November 17, 2022, based on the argument that the application of Section 922(g)(1) to him violates the Second Amendment.  (Doc. 50.)  The court denied the motion on November 23, 2022, based on the state of the law at that time.  (*See* Doc. 53.)  Harper then filed a motion for reconsideration of the court's order denying his motion to dismiss.  (Docs. 56.)  Therein, he asserted that reconsideration was warranted because, following the court's denial of his motion to dismiss, the Third Circuit vacated the panel opinion in *Range v. Attorney General*, 53 F.4th 262 (3d Cir. 2022) (*per curiam*), and set the case for *en banc* review.  (*Id.*)  The court granted Harper's motion for reconsideration and reinstated his motion to dismiss, but stayed the motion pending the Third Circuit's *en banc* decision.  (Doc. 57.)  While awaiting the Third Circuit's decision and following a suppression hearing and supplemental briefing, the court denied Harper's motion to suppress on February 24, 2023.  (Doc. 58.)  On March 7, 2023, Harper filed a motion for reconsideration of the court's suppression ruling as well as a brief in support.  (Docs. 59, 60.)  The Government opposed the motion on March 21, 2023. (Doc. 61.)

On June 6, 2023, the Third Circuit issued an *en banc* opinion in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) ("*Range I*"), finding that Section 922(g)(1) violates the Second Amendment as applied to Bryan Range based on the application of the holding in *New York State Rifle Association v. Bruen*, 597 U.S. 1

(2022).  The court ordered supplemental briefing on Harper's motion to dismiss based on *Range I*.  (Doc. 65.)  Once ripe, the court granted Harper's motion to dismiss finding that Section 922(g)(1) violated the Second Amendment as applied to Harper.  (Docs. 66, 80, 81, 82, 83.)  Because the court granted Harper's motion to dismiss, it did not rule on his motion for reconsideration of the court's suppression ruling.

The Government appealed the court's decision, and on January 17, 2025, the Third Circuit reversed the court's decision and remanded this case for further proceedings.  (Doc. 93.)  With permission from the court, Harper filed a second motion to dismiss and a supplemental brief in support of his motion for reconsideration of the court's order denying his motion to suppress.  (Docs. 116, 117.)  The Government filed briefs in opposition and Harper filed a reply brief. (Docs. 118, 119, 126.)  Thus, Harper's second motion to dismiss, Doc. 116, and motion for reconsideration of the suppression ruling, Doc. 59, are ripe for resolution.

## MOTION FOR RECONSIDERATION

### A. Standard of Review

A party seeking reconsideration of a district court's order must show either (1) "an intervening change in the controlling law"; (2) the availability of new evidence that was not available when the court issued its prior order; or (3) "the

need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (citing *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995)). Motions for reconsideration "cannot be used to reargue issues that the court has already considered and disposed of." *McSparren v. Pennsylvania*, 289 F. Supp. 3d 616, 621 (M.D. Pa. 2018) (citing *Blanchard v. Gallick*, No. 1:09-CV-01875, 2011 WL 1878226 at *1 (M.D. Pa. May 17, 2011)). Additionally, a motion for reconsideration "may not be used to present a new legal theory for the first time" or "to raise new arguments that could have been made in support of the original motion." *MMG Ins. Co. v. Guiro, Inc.*, 432 F. Supp. 3d 471, 474 (M.D. PA. 2020) (citing *Vaidya Xerox Corp.*, No. 97-CV-00547, 1997 WL 732464, *2 (E.D. Pa. Nov. 25, 1997)). A "mere disagreement" with a court's legal conclusion is not a sufficient basis for reconsideration. *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 73 F. Supp. 3d 488, 491 (M.D. Pa. 2014) (citing *Mpala v. Smith*, No. 3:06-CV-00841, 2007 WL 136750, at *2 (M.D. Pa. Jan. 16, 2007)).

## B. Discussion

Harper argues that the court should reconsider its order denying the motion to suppress evidence because the court failed to address arguments related to his status on probation and an alleged violation of *Miranda v. Arizona*, 384 U.S. 436

4

(1966).  (Doc. 117, pp. 6–14.)[1]  In opposing reconsideration, the Government argues that the court did not overlook or fail to address any arguments, rather, Harper is making these arguments for the first time in his motion for reconsideration.  (Doc. 118, pp. 14–18.)  The Government notes that if the court denies Harper's motion for reconsideration, it does not oppose Harper having the opportunity to raise the suppression arguments in a new pretrial motion.  (*Id.* at p. 18 n.5.)

The court has carefully reviewed the prior filings in this case, as well as the court's order denying Harper's motion to suppress.  The court agrees with the Government that Harper's arguments are new.  Harper's arguments do not present an intervening change in law, new evidence, or a need to correct a clear error of law or fact or to prevent manifest injustice.  Accordingly, the court will deny Harper's motion for reconsideration.  However, because the parties have fully briefed the arguments regarding Harper's status on probation and an alleged *Miranda* violation, and knowing that the Government does not oppose the filing of a new pretrial motion, the court will review these arguments as if they were presented in a new pretrial motion.

---

[1] For ease of reference, the court uses the page numbers from the CM/ECF header.

**MOTION TO SUPPRESS**

## A. Factual Findings[2]

### 1. Underlying State Criminal Case

Harper was sentenced on June 1, 2016, on the charges in Dauphin County dockets CP-22-CR-2826-2014 and CP-22-CR-4188-2014. (Doc. 41, p. 1.) On May 4, 2017, after a parole violation hearing, Harper was resentenced to two years of intermediate punishment with a maximum date of May 4, 2019. (*Id.* at 1–2.)

During this period of intermediate punishment, Adult Probation Officer Brandon Rigel ("PO Rigel") was assigned to supervise Harper. (*Id.* at 2.) PO Rigel testified that as Harper was approaching his max date, he was in violation for failing to pay the required fines and costs. On April 3, 2019, Harper signed a Notice of Alleged Violations of Probation/Parole/Intermediate Punishment documenting his failure to pay. (Gov't Hrg. Ex. 1.) The notice stated that his remaining balance was $3,742.34 and that a revocation hearing "has been or will be scheduled" before the Court of Common Pleas. PO Rigel testified that, when an offender signs a notice of violation prior to their max date, their time is put on hold; that is, their intermediate punishment does not terminate on the max date, and they are scheduled for a revocation hearing.

---

[2] The factual findings are taken from the parties' briefs and corresponding exhibits for the motion to suppress and motion for reconsideration, and from the November 3, 2022 evidentiary hearing transcript and exhibits. (Docs. 41, 46, 52, 59, 60, 61, 89, 116, 117, 118, 126.)

6

Following Harper's receipt of the notice, PO Rigel continued to meet with him every month, and Harper assured PO Rigel that he was going to pay off the fees. PO Rigel testified that, to avoid possible adverse consequences for Harper, he waited several months—providing Harper the chance to pay off the fees—before issuing an official violation. Months later, after Harper failed to pay the fees, PO Rigel gave Harper two options. The first was that Harper could have a hearing with the Court of Common Pleas. The second was that Harper could have a "paper revocation." PO Rigel testified that, at the time of Harper's violation, paper revocations were common practice in Dauphin County.

A paper revocation would extend Harper's intermediate punishment by 24 months, but the extended punishment would end once his balance was paid in full. Because a court hearing could result in greater punishment, such as work release, Harper opted for a paper revocation. On September 24, 2019, Harper signed an Admission and Acknowledgement of Violation, consenting for Dauphin County Court of Common Pleas Judge Curcillo to revoke Harper's "probation, parole or intermediate punishment without [Harper's] presence in court." (Gov't Hrg. Ex. 2.) As a result, on October 2, 2019, Judge Curcillo, having reviewed Harper's acknowledgement, issued an order extending Harper's intermediate punishment for two years to a new max date of October 2, 2021. (*Id.*)

7

### 2. Probation Officer's September 2020 Visit to Harper's Home and Search

After the extension of Harper's intermediate punishment, in or around July 2020, a state employee showed PO Rigel one or more photographs which Harper had posted on social media in which both Harper and Harper's girlfriend were holding firearms. Due to Harper's criminal history, his possession of a firearm was unlawful.

On September 16, 2020, PO Rigel arrived at Harper's residence for an initial home check because Harper had moved to a new residence. Harper invited PO Rigel into his home. Upon entering the home, PO Rigel noted an overwhelming smell of burnt marijuana. Seemingly without prompting, Harper admitted to having smoked marijuana. Because it was PO Rigel's first time at the residence, he asked Harper to give him a tour. As Harper took PO Rigel through his bedroom, PO Rigel noticed a half-smoked marijuana blunt, a marijuana grinder, and a clear cellophane plastic bag containing suspected marijuana on Harper's nightstand.

Upon leaving the bedroom, PO Rigel noticed Harper's eyes fixate on a black Louis Vuitton backpack on the couch. PO Rigel told Harper that it was a very nice bag. PO Rigel picked up the bag and asked Harper if it was his. PO Rigel noticed the bag's weight—it was heavy—and saw Harper's eyes get very large. Harper told PO Rigel that the bag was his girlfriend's.

PO Rigel put the bag down and left through the front door of the residence to consult his partner, Adult Probation Officer Rick Anglemeyer ("PO Anglemeyer"). He told PO Anglemeyer about Harper's suspicious reaction to the bag and asked him to come inside.[3]  Returning into the house, PO Rigel asked Harper to place his hands behind his back and told Harper that he was being detained for violating his terms based on the possession of marijuana and drug paraphernalia.  While detained in handcuffs, PO Rigel asked Harper if there was any other contraband in his residence that was illegal or would constitute a violation of his terms of probation.  Harper said that there was, and that it was not his.  When asked what the contraband was, Harper responded that it was his girlfriend's and that she had a license.  PO Anglemeyer asked if "it" was a gun, and Harper affirmed that it was.

PO Rigel asked for verbal consent to search the residence, and Harper gave it.  PO Rigel did not specifically ask for consent to search the Louis Vuitton bag. PO Anglemeyer picked up the Louis Vuitton bag and opened it.  Inside, he found a Beretta pistol and two deposit receipts from Harper's bank account.  At this time, PO Rigel provided Harper with a *Miranda* warning, which Harper acknowledged understanding.  PO Rigel then asked if he could search Harper's cellphone.  Harper consented and unlocked his phone for the search.  Looking at the photos on

---

[3] PO Rigel's testimony does not precisely state when he told PO Anglemeyer about the bag, but his testimony makes clear that it occurred before PO Anglemeyer searched the bag.

Harper's phone, PO Rigel found one or more pictures of Harper holding the Louis Vuitton bag and holding the Beretta pistol.

### B. Discussion

#### 1. The court assumes, without deciding, that the extension of Harper's supervision was unlawful.

In what the court is construing as a new pre-trial motion to suppress, Harper spends the majority of his brief attempting to prove that he was no longer lawfully on supervision at the time his residence was searched. (Doc. 117, pp. 6–14.) Harper submits that his probation was never lawfully extended, thus, he was no longer on probation at the time of the search making it unlawful, and the good faith exception is inapplicable because he was not on any type of supervision. (*Id.*) For its part, the Government simply submits that it is not clear that the October 2019 revocation order was unlawful under Pennsylvania law. (Doc. 118, p. 27.)

For purposes of this case, the court assumes, without deciding, that the October 2019 extension of Harper's probation was unlawful.

#### 2. Applying the good faith exception, the search of Harper's residence was lawful.

In his original briefs, Harper argued that the good faith exception was inapplicable because he was not under lawful supervision at the time of the search and, therefore, not "subject to the authority of the probation officer." (Doc. 41, pp. 6–8; *see also* Doc. 52, pp. 3–5.) Harper submits that the court should not ignore

PO Rigel's "willful and negligent" conduct as it is the type that the exclusionary rule aims to deter. (Doc. 41, p. 8; Doc. 52, pp. 3–5.)

The Government argues that regardless of the lawfulness of Harper's probation extension, there are four reasons that the good faith exception to the exclusionary rule applies here. (Doc. 118, pp. 18–28.) First, at the time of the search, the October 2019 order had been in place for approximately one year, and Harper and PO Rigel continued with the supervisor/supervisee relationship. (*Id.* at 25.) Thus, PO Rigel had no reason to believe that his supervision of Harper was unlawful. (*Id.*) Second, PO Rigel or any other trained officer had no reason to know that the October 2019 extension order was unlawful because this type of order was common practice in the Dauphin County Court of Common Pleas at that time. (*Id.* at 26.) Third, it is not clear under Pennsylvania law that the October 2019 extension order is unlawful. (*Id.* at 27.) And fourth, the Government submits that it "makes little practical or common sense to conclude that Officer Rigel did not act in good faith." (*Id.* at 28.) The record suggest that PO Rigel made an effort to work with Harper to avoid a revocation of his probation due to the unpaid fines and there is no evidence that PO Rigel acted in a "rogue or malicious" manner. (*Id.* at 28.) Therefore, the Government argues that these reasons support the finding that "no reasonably well-trained probation officer would have known or

had reason to know that Harper was not on probation and that the warrantless search (with reasonable suspicion) was illegal." (*Id.*)

The United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To deter constitutional violations, the exclusionary rule requires that evidence derived from such violations may not be used at trial. *United States v. Pelullo*, 173 F.3d 131, 136 (3d Cir. 1999) (citations omitted).

But the rule does not bar all illegally obtained evidence. Instead, "[i]f . . . the exclusionary rule does not result in appreciable deterrence, then, clearly, its use in the instant situation is unwarranted." *United States v. Leon*, 468 U.S. 897, 909 (1984). Because the purpose of this doctrine is deterrence, that purpose would not be served by excluding evidence that is derived "when law enforcement officers have acted in objective good faith." *See id.* at 907–08. In these instances of good faith, or where the transgressions of law enforcement "have been minor, the magnitude of the benefit conferred on such guilty defendants" by excluding evidence of culpability "offends basic concepts of the criminal justice system." *Id.* at 908.

In recent decades, the "reach of the good faith exception" has expanded while the "scope of the exclusionary rule" has narrowed. *United States v. Caesar*,

2 F.4th 160, 169 (3d Cir. 2021) (citation omitted). The "exclusionary rule applies only where the official conduct is sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. To trigger the exclusionary rule, law enforcement conduct must be deliberate, reckless, or grossly negligent, or involve recurring or systemic negligence." *Id.* (internal quotation marks omitted) (quoting *Herring v. United States*, 555 U.S. 135, 143–44 (2009)). By contrast, "simple, isolated negligence . . . does not warrant suppression." *Id.* (internal quotation marks omitted) (quoting *Davis v. United States*, 564 U.S. 229, 238 (2011)). To assess whether the exclusionary rule applies, a court "must determine whether—on these particular facts—the agents acted with a good faith belief in the lawfulness of their conduct that was 'objectively reasonable.'" *United States v. Katzin*, 769 F.3d 163, 182 (quoting *Davis*, 564 U.S. at 237–39).

A warrantless search of a parolee's residence may also reasonable under the Fourth Amendment "when an agent reasonably believes that the premises contain evidence of a parole violation." *Keating v. Pittston City*, 643 F. App'x 219, 223 (3d Cir. 2016) (citation omitted). The existence of reasonable suspicion depends upon whether, under the totality of the circumstances, an agent "has a particularized and objective basis for suspecting legal wrongdoing." *Id.* at 224 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

13

Because the court is assuming, without deciding, that Harper was not lawfully on probation at the time of the search, the court therefore assumes without deciding that the Fourth Amendment was violated in conducting the search of Harper's residence. However, the court must also consider the good faith exception to the exclusionary rule.

The court agrees with the Government that PO Rigel had no reason to believe that Harper's continued supervision was unlawful. He testified that it was common practice in Dauphin County to have paper revocations for failing to pay fees rather than subjecting the supervisee to a full revocation hearing that could have varying consequences. PO Rigel's understanding was that, although only a judge could extend supervision, signing a notice of alleged violations before the maximum sentence date tolled a supervisee's sentence. (Doc. 89, pp. 8–10, 28–29.) From his understanding, a court was then permitted to revoke a supervisee's release if the violation continued past the maximum sentence date. (*Id.*) Furthermore, Harper and PO Rigel carried on with their supervisor-supervisee relationship because both believed Harper was still on probation.

Lastly, as argued by the Government, there is no evidence in the record suggesting that PO Rigel acted in a reckless or malicious manner. Rather, it appears that PO Rigel was attempting to work with Harper to give him additional time to pay his fines, rather than immediately having his probation revoked. On

14

this record, the court finds that PO Rigel acted on the good faith belief that his actions were lawful.  As a result, there would be no deterrent effect by excluding the evidence in this case.  At worst, PO Rigel was negligent in using the paper revocation process, but simple negligence does warrant suppression.  *See Caesar*, 2 F.4th 169.  Thus, the court finds that PO Rigel acted with the good faith belief that Harper was still on probation at the time PO Rigel conducted the home check at his new residence.  Given this, it was objectively reasonable to conduct a warrantless search of Harper's residence based on reasonable suspicion of criminality, *i.e.* the overwhelming smell of burnt marijuana and Harper's admission that he smoked marijuana.

For these reasons, the motion to suppress will be denied.

### 3. Whether there is a *Miranda* violation in this case requires further briefing.

Harper does not address the *Miranda* issue in his most recent briefing.  (*See* Docs. 117, 126.)  However, Harper's prior briefing addressed this issue cursorily.  (*See* Docs. 41, pp. 5–6; Doc. 60, pp. 7–8.)  Therein, Harper argued that all statements made after the "illegal entry and detention were obtained in violation of *Miranda* and thereby fruit of the poisonous tree."  (Doc. 60, p. 7.)  In opposition, the Government argues that that any pre-*Miranda* statements should not be suppressed because the interaction between Harper and PO Rigel was brief, and Harper was detained on a probation violation.  (Doc. 118, pp. 29–31.)  As to the

post-*Miranda* statements, the Government submits that Harper's statements were voluntarily, knowingly, and intelligently made.  (*Id.*)

During the evidentiary hearing, PO Rigel agreed that once Harper was detained in his residence, he was handcuffed, not free to leave, and in custody. However, Harper had not yet been *Mirandized* before PO Rigel asked whether there was contraband in the house and or prior to the series of responses and questions that followed.  After Harper provided verbal consent to search the house and PO Rigel and Anglemeyer located the firearm in the Louis Vuitton bag, for the first time, Harper was *Mirandized*.  Harper then made additional statements after he received the *Miranda* warning.

Although the evidentiary record is seemingly complete on this issue, the briefing is very limited, and it is unclear to the court which statements Harper seeks to suppress.  Accordingly, the court will permit Harper to file a new motion to suppress addressing only the *Miranda* issue.  The court does not believe another evidentiary hearing is necessary, but one can be convened at the parties' request if they believe it is necessary.

16

**MOTION TO DISMISS**

**A. Standard of Review**

Federal Rule of Criminal Procedure 12 allows parties to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." FED. R. CRIM. P. 12(b)(1). In his pretrial motion to dismiss, Harper asserts an as-applied challenge to the constitutionality of Section 922(g)(1). (*See* Docs. 50, 51, 117, 126.) In order to resolve an as-applied challenge, the court determines whether a law with some permissible uses "is nonetheless unconstitutional as applied" to the movant's conduct. *Spence v. Washington*, 418 U.S. 405, 414 (1974).

**DISCUSSION**

Harper incorporates his arguments from his prior motion to dismiss that the court granted but was vacated by the Third Circuit. (*See* Docs. 50, 66, 81, 82, 83, 92.) In his original motion, Harper argued that the court should dismiss the Section 922(g)(1) charge of felon in possession of a firearm based on the *en banc* ruling in *Range I*, because it applied the holding of *New York State Rifle Association v. Bruen*, 597 U.S. 1 (2022), to find Section 922(g)(1) unconstitutional as applied to Bryan Range. (Doc. 66, pp. 3–9.) Specifically, Harper argued, pursuant to *Bruen* and *Range*, that he has a Second Amendment right to possess a firearm despite being a convicted felon; Section 922(g)(1) regulates Second

17

Amendment conduct; and that the Government cannot show that Section 922(g)(1) is consistent with the Nation's "historical tradition of firearm regulation." (*Id.*)

Harper further noted that *Range* is binding precedent for this court, and the Government's disagreement with the holding of *Range* and contrary non-binding authorities are inconsequential. (Doc. 81, p. 3.) Harper asserted that the Government's argument that he must establish that he possessed the firearms for a lawful purpose "reads a requirement into the *Bruen/Range* analysis that does not exist." (*Id.* at 2.) Harper also contended that his status as a state parolee is irrelevant under the *Bruen/Range* analysis. (*Id.* at 2–3.) Harper argued that the Government has not met its burden of establishing that Section 922(g)(1) comports with the Nation's "historical tradition of firearm regulation," given that "the *Range* court rejected the very arguments the Government rehashes here." (*Id.* at 3–6.)

In Harper's renewed motion to dismiss, he argues that the Third Circuit's opinion vacating this court's prior order was based on the erroneous belief that Harper was on supervision at the time he possessed the firearm. (Doc. 117, p. 7.) Harper argues that there was no court order extending his supervision, thus, he was not lawfully on supervision at the time of the offense. (*Id.* at 7–9.) Thus, because he was not lawfully on supervision, the Third Circuit's decision was not based the correct facts or law, and this court should again grant his motion to dismiss. (*Id.*)

18

The Government argues that the court cannot resolve Harper's motion to dismiss on the present record because there are factual issues with respect to whether Harper's supervision was lawful at the time at issue in this case. (Doc. 119, 9–11.) In that instance, if Harper's supervision was lawful, then the law of the case forecloses Harper's argument. (*Id.*) If the supervision was unlawful, the court would need to consider Harper's argument. (*Id.*)

Notwithstanding the supervision argument, the Government submits that even if Harper was not under supervision, Section 922(g)(1) is constitutional as applied to Harper. (*Id.* at 11–40.) The Government essentially concedes that Harper is one of "the people" protected by the Second Amendment pursuant to *Range*, but argues that Harper's motion should be denied because the prohibition on firearm possession in Section 922(g)(1) as applied to Harper is supported by relevant historical tradition and consistent with *United States v. Rahimi*, 602 U.S. 680 (2024), *Range v. Attorney General*, 124 F.4th 218 (3d Cir. 2024) ("*Range II*"), *United States v. Quailes*, 126 F.4th 215 (3d Cir. 2025), and *Pitsilides v. Barr*, 128 F.4th 203 (3d Cir. 2025). (*Id.*)

In reply, Harper continues to argue the issues surrounding his supervision and submits that it is irrelevant this his prior record precludes firearm possession when it has been established that the firearm would not have been discovered but for "the illegal and unconstitutional search." (Doc. 126, pp. 2–13.) Harper further

19

argues that his criminal history does not establish that he presents a "special danger" of misusing firearms. (*Id.* at 13–16.)

Here, the court makes two assumptions before deciding the motion to dismiss. The court assumes, without deciding, that the court is able to reconsider the factual premise of the Third Circuit's holding on direct appeal. Additionally, the court assumes, without deciding, that Harper was not lawfully on state supervision. In addition, because the court ruled *supra* that the good faith exception applies, the search of the residence that led to the discovery of the firearm was lawful. Based on these premises, the court analyzes Harper's motion to dismiss Section 922(g)(1) under the current state of Second Amendment jurisprudence.

### B. The Text of the Second Amendment and Significant Rulings on the Second Amendment

The text of the Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.

### 4. Supreme Court Precedent from *Heller* to *Rahimi*

There was a sea change in the Supreme Court's analysis of the Second Amendment from the militia-based rationale articulated in *United States v. Miller*, 307 U.S. 174 (1939), to the pre-existing individual right explained in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. Chicago*, 561 U.S. 742

(2010). In those decisions, the Court "recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." *Bruen*, 597 U.S. at 8–9 (citing *Heller*, 554 U.S. at 570; *McDonald*, 561 U.S. at 742). And then, in 2022, the Court held in *Bruen* "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Id.*

Importantly, in *Bruen*, the Court established a two-step test to determine if a particular regulation violates the Second Amendment:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, . . . the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 24 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961)). To measure consistency with historical firearm regulations, the modern regulation must be "relevantly similar" to historical predecessors. *Id.* at 29. The Court explained that the burden on the Government is to identify a "well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 30. And then, in *Rahimi*, the Court clarified that, when conducting *Bruen's* history-and-tradition inquiry, "the

21

appropriate analysis . . . [is] whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." 602 U.S. at 692. The Court rejected the idea that the examination of historical analogues signals "a law trapped in amber." *Id.* at 691.

### 5. Third Circuit Precedent Applying *Bruen* and *Rahimi*

The Third Circuit had occasion to apply both *Bruen* and *Rahimi* in the appeal filed in the *Range* case. This appeal traveled a long procedural road to finality. In 2020, Bryan Range filed suit in the Eastern District of Pennsylvania, seeking a declaration that Section 922(g)(1) violates the Second Amendment as applied to him. Applying then-controlling Third Circuit precedent, *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), *Binderup v. Attorney General*, 836 F.3d 336 (3d Cir. 2016) (en banc) (plurality), *Holloway v. Attorney General*, 948 F.3d 164 (3d Cir. 2020), and *Folajtar v. Attorney General*, 980 F.3d 897 (3d Cir. 2020), the district court granted summary judgment to the Government. *Range v. Lombardo*, 557 F. Supp. 3d 609, 611, 613–14 (E.D. Pa. 2021). Range appealed.

While his appeal was pending, the Supreme Court decided *Bruen*. A Circuit panel affirmed the district court decision, applying *Bruen* and concluding that the Government met its burden to show that Section 922(g)(1) reflects the Nation's historical tradition of firearm regulation. *Range v. Att'y Gen.*, 53 F.4th 262, 266 (3d Cir. 2022) (per curiam). Range petitioned for rehearing en banc, and the

Circuit granted the petition and vacated the panel opinion. *Range v. Att'y Gen.*, 56 F.4th 992 (3d Cir. 2022). The en banc court reversed and remanded for the District Court to enter judgment in favor of Range, finding that Range remained one of "the people" protected by the Second Amendment and the Government did not show that the Nation has a longstanding history and tradition of disarming people like Range. *Range I*, 69 F.4th at 98.

The Government filed a petition for writ of certiorari. While that petition was pending, the Supreme Court decided *Rahimi*. The Court then vacated *Range I* and remanded for further consideration. *Garland v. Range*, 144 S. Ct. 2706 (2024).

In the second en banc opinion following remand, the Third Circuit reached the same conclusions as in *Range I*. The Circuit concluded that Bryan Range remains one of "the people" for purposes of the Second Amendment notwithstanding his prior conviction. *Range II*, 124 F.4th at 226–28. The Circuit next concluded that Section 922(g)(1) regulates Second Amendment conduct and "'the Constitution presumptively protects that conduct.'" *Id.* at 228 (quoting *Bruen*, 597 U.S. at 17). The Circuit then examined whether the Government had shown that applying Section 922(g)(1) to Range would be "'consistent with the Nation's historical tradition of firearm regulation'" and concluded that it had not

23

carried its burden.  *Id.* (quoting *Bruen*, 597 U.S. at 24).  The Third Circuit

concluded its analysis as follows:

> Our decision today is a narrow one.  Bryan Range challenged the constitutionality of 18 U.S.C. § 922(g)(1) only as applied to him given his violation of 62 Pa. Stat. Ann. § 481(a).  Range remains one of "the people" protected by the Second Amendment, and his eligibility to lawfully purchase a rifle and a shotgun is protected by his right to keep and bear arms.  More than two decades after he was convicted of food-stamp fraud and completed his sentence, he sought protection from prosecution under § 922(g)(1) for any future possession of a firearm.  The record contains no evidence that Range poses a physical danger to others.  Because the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms, § 922(g)(1) cannot constitutionally strip him of his Second Amendment rights.

*Id.* at 232.

Soon after *Range II* was decided, the Third Circuit addressed another civil

case in which a plaintiff convicted of a felony offense brought suit seeking a

declaration that application of Section 922(g)(1) to him would violate the Second

Amendment.  *Pitsilides v. Barr*, 128 F. 4th 203 (3d Cir. 2025).  Upon examination

of *Bruen*, *Rahimi*, and *Range II*, the Court explained the "upshot of these cases."

*Id.* at 210–11.  First, a court's "inquiry into *principles* that underlie our regulatory

tradition does not reduce historical analogizing to an exercise in matching elements

of modern laws to their historical predecessors."  *Id.* at 210 (emphasis supplied).

Second, "whatever other recourse may or may not be available, felons seeking to

challenge the application of § 922(g)(1) at least may bring declaratory judgment

24

actions" and relief may be granted on a record sufficient to enable "individualized

fact-finding." *Id.* Finally, "while *Rahimi* and *Range II* did not purport to

comprehensively define the metes and bounds of justifiable burdens on the Second

Amendment right, they do, at a minimum, show that disarmament is justified as

long as a felon continues to 'present a special danger of misus[ing firearms],' in

other words, when he would likely 'pose[] a physical danger to others' if armed."

*Id.* (quoting *Rahimi*, 602 U.S. at 698; *Range II*, 124 F.4th at 232). The *Pitsilides*

decision makes clear that the "'Second Amendment's touchstone is

dangerousness.'" *Id.* at 210–11 (quoting *Folajtar*, 980 F.3d at 924 (Bibas, J.,

dissenting); citing *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J.,

dissenting), *United States v. Bullock*, 123 F.4th 183, 185 (5th Cir. 2024) (per

curiam), *United States v. Williams*, 113 F.4th 637, 657 (6th Cir. 2024), and *United

States v. Jackson*, 110 F.4th 1120, 1128 (8th Cir. 2024)).

Ultimately, the Court remanded to the District Court for additional discovery

probative "to the prevailing Second Amendment analysis, including whether

Pitsilides poses a special danger of misusing firearms in a way that would endanger

others." *Pitsilides*, 128 F.4th at 213. However, the Court instructed that:

> Courts adjudicating as-applied challenges to § 922(g)(1) must consider
> a convict's entire criminal history and post-conviction conduct
> indicative of dangerousness, along with his predicate offense and the
> conduct giving rise to that conviction, to evaluate whether he meets the
> threshold for continued disarmament. As *Range II* illustrated,
> consideration of intervening conduct plays a crucial role in determining

25

whether application of § 922(g)(1) is constitutional under the Second Amendment. *See* 124 F.4th at 232. Indeed, such conduct may be highly probative of whether an individual likely poses an increased risk of "physical danger to others" if armed. *Id.*

*Id.* at 212. That is because an individual may be disarmed "consistent with the historical principle that legislatures may disarm a person who poses a danger to the physical safety of others." *Id.* (citing *Rahimi*, 602 U.S. at 693; *Range II*, 124 F.4th at 232; *Bullock*, 123 F.4th at 185; *Williams*, 113 F.4th at 662; and *Jackson*, 110 F.4th at 1128.) Further, the Court observed that "both history and common sense reflect that this 'dangerousness' includes not only direct involvement in physical violence" but also conduct that is "'dangerous because [it] often lead[s] to violence,'" such as burglary and drug dealing. *Id.* at 213 (quoting *Folajtar*, 980 F.3d at 922 (Bibas, J., dissenting); citing *Williams*, 113 F.4th at 659). This assessment "necessarily requires individualized factual findings." *Id.*

The Third Circuit has issued two non-precedential decisions in criminal cases following the decisions in *Range II* that provide additional guidance relevant to this matter. In *United States v. White*, No. 23-3013, 2025 WL 384112, at *2 (3d Cir. Feb. 4, 2025), *cert. denied*, No. 24-7158 (June 16, 2025), the Court rejected the Second Amendment challenge to Section 922(g)(1) because White's "prior felony convictions for drug distribution, aggravated assault, and carrying a firearm without a license demonstrate that he 'present[s] a special danger of misus[ing firearms],' and would likely pose an increased risk of 'physical danger to others' if

armed." 2025 WL 384112, at *2 (quoting *Rahimi*, 602 U.S. at 698; *Range II*, 124 F.4th at 232). Looking at White's entire criminal history, the Court concluded that his convictions, considered collectively, show that White would pose a danger to others if armed because his prior criminal activities could lead to violent confrontation. *Id.* (citing *Williams*, 113 F.4th at 659 for the proposition that legislatures may disarm those convicted of crimes like drug dealing because such crimes pose a significant threat of danger, warranting disarmament).

In *United States v. Williams*, No. 23-2773, 2025 WL 1341877, at *2 (3d Cir. May 8, 2025), the Court concluded that the District Court did not commit plain error in rejecting Williams' Second Amendment challenge. That is because Williams has a lengthy criminal history that distinguished him from Bryan Range, including two convictions for possession of cocaine with intent to distribute, one conviction for possession of marijuana with intent to distribute, and one conviction for child endangerment. *Id.* Given Williams' "dramatically different criminal record," the Circuit's narrow holding in *Range II* did not compel the dismissal of the Section 922(g)(1) conviction. *Id.*

Finally, there are two additional precedential decisions from the Third Circuit that provide additional guidance with respect to the analysis of a Second Amendment challenge to Section 922(g)(1). In *United States v. Moore*, 111 F.4th 266, 273 (3d Cir. 2024), *cert. denied*, No. 24-968 (June 30, 2025), the Third

Circuit held that "[a] convict completing his sentence on [federal] supervised release does not have a Second Amendment right to possess a firearm." And, in *United States v. Quailes*, 126 F.4th 215, 224 (3d Cir. 2025), *cert. denied*, No. 24-7033 (Oct. 6, 2025), the Third Circuit extended the holding in *Moore* to individuals on state parole or probation. However, this precedent is not controlling in this case because the court is assuming (without deciding) the defendant was not on any form of supervision at the time of the alleged offense conduct.

### C. Application of Relevant Precedent to Defendant's Second Amendment Challenge

#### 1. *Bruen* Step One Analysis

The first question is whether the text of the Second Amendment applies to Defendant and his proposed conduct. *See Bruen*, 597 U.S. at 31–33; *Range II*, 124 F.4th at 225; *Pitsilides*, 128 F.4th at 209. Here, the Government essentially concedes that Harper remains among "the people" despite his felony convictions. (*See* Doc. 119.) Rightfully so, based on the controlling precedent in *Range II* concluding that an individual who has a felony conviction remains among "the people." *See Range II*, 124 F.4th at 228.

In *Range II*, the Court characterized "the easy question" as "whether § 922(g)(1) regulates Second Amendment conduct." 124 F.4th at 228. The Court then stated: "It does." *Id.* In relevant part, the statute makes the possession of any firearm or ammunition unlawful for a person convicted of an offense punishable by

28

imprisonment for a term exceeding one year.  18 U.S.C. § 922(1).  The statute criminalizes the possession of any firearm or ammunition for any purpose (lawful or otherwise) by this class of persons.  And it appears that the Circuit determined in *Range II* that this regulation of this specific conduct is clearly covered by the Second Amendment.

The court also notes that in the non-precedential *White* decision, where the criminal defendant argued that Section 922(g)(1) is unconstitutional as applied to him, the Circuit did not address the first *Bruen* question at all, and only addressed the second *Bruen* question.  2025 WL 384112 at *2.  Since *Bruen* instructs that the second step of conducting a historical tradition analysis is only necessary when the person and his conduct are covered by the Second Amendment, 597 U.S. at 24, this may suggest that the Circuit has determined that the first *Bruen* question did not require further discussion in the context of a Second Amendment challenge to Section 922(g)(1).  On the other hand, it may suggest that when a defendant's challenge fails at the second *Bruen* step, as was the case in *White*, it is not necessary to analyze the first *Bruen* step.  In any event, the Circuit clearly did not analyze whether the defendant in *White* stated a purpose for his possession of a firearm.

## 2. *Bruen* Step Two Analysis

Having determined that the defendant and his conduct are covered by the Second Amendment and presumptively protected, the court must next determine "whether the Government can strip him of his right to keep and bear arms" by analyzing whether application of Section 922(g)(1) to this defendant is "'consistent with the Nation's historical tradition of firearm regulation.'" *Range II*, 124 F.4th at 228 (quoting *Bruen*, 597 U.S. at 24); *see also Pitsilides*, 128 F.4th at 209.

The court's analysis of the *Bruen* step two question is guided by the controlling precedent in *Range II* and *Pitsilides*. As detailed previously, the court will assess this question according to "the prevailing Second Amendment analysis, including whether [the individual at issue] poses a special danger of misusing firearms in a way that would endanger others." *Pitsilides*, 128 F.4th at 213. The court will consider the defendant's "entire criminal history and post-conviction conduct indicative of dangerousness, along with his predicate offense and the conduct giving rise to that conviction, to evaluate whether he meets the threshold for continued disarmament." *Pitsilides*, 128 F. 4th at 212. That is because an individual may be disarmed "consistent with the historical principle that legislatures may disarm a person who poses a danger to the physical safety of others." *Id.*; *see also Range II*, 124 F.4th at 230 (citing *Rahimi* in support of the proposition that disarming (at least temporarily) physically dangerous people based

30

on a finding that such person poses a safety threat is consistent with the historical tradition of disarming people who pose a clear threat of physical violence to another); *United States v. Bullock*, 123 F.4th 183, 185 (5th Cir. 2024); *United States v. Williams*, 113 F.4th 637, 649–663 (6th Cir. 2024).

In conducting this analysis, the court is mindful of the narrowness of the *Range II* holding.  The Circuit found only that our Nation's history and tradition do not support permanent disarmament of Bryan Range who only has a two-decades old conviction for food-stamp fraud and there is no evidence of ongoing recidivism or threat of physical danger to others.  *See Range II*, 124 F.4th at 232.  In assessing whether the criminal record and available background information about the defendant in this case lead to the conclusion that the defendant is, in fact, sufficiently dangerous so that the application of Section 922(g)(1) to him is consistent with the Second Amendment, the court will view Bryan Range as one data point on the dangerousness spectrum, specifically, on the far end of non-dangerousness.

The Government contends that applying Section 922(g)(1) to Harper is constitutional because it is consistent with "the tradition of imposing limits on the right to keep and bear arms when a legislature draws a class-wide conclusion that members of the class pose a danger to themselves or others with firearms, and particularly where Harper's own criminal history demonstrates that he poses a risk

31

of danger if armed." (Doc. 119, p. 35.)  The Government submitted Harper's rap sheet as an exhibit, which details his prior Pennsylvania felony convictions, which include: five counts of robbery in 2003; one count of criminal conspiracy for robbery in 2003; one count of possession with intent to manufacture or deliver a controlled substance in 2008 and two counts of the same in 2014; one count of conspiracy for possession with intent to manufacture or deliver a controlled substance in 2014; and one count of flight to avoid apprehension, trial, or punishment in 2014.  (*Id.* at 3; Doc. 119-1.)  Harper also has convictions for a variety of misdemeanor offenses between 2003 and 2014.  (Doc. 119, p. 3; Doc. 119-1.)  The Government submits that the prior felony convictions alone provide a basis to reject Harper's constitutional challenge based on the demonstrated dangerousness of Harper's offenses as well as a serious disregard for the law. (Doc. 119, pp. 35–40.)

Harper maintains that permanent disarmament through application of Section 922(g)(1) as applied to him is unconstitutional because he does not present a "'special danger' of misusing firearms." (Doc. 126, pp. 13–16.)  He notes his prior robbery convictions did not include a charge for firearm possession and since the early 2000s robbery convictions, Harper has not been charged with any firearm violations or violent offenses.  (*Id.* at 13–14.)

Having considered both parties' arguments, the court concludes that Harper's eleven prior felony convictions, which include four felony drug trafficking convictions and five robbery convictions, demonstrate that Harper presents a danger of misusing firearms and would likely pose an increased risk of physical danger to others if permitted to be armed. *See White*, 2025 WL 384112 at *2 (holding that defendant's prior criminal convictions for possession with intent to distribute controlled substances, aggravated assault, and carrying an unlicensed firearm "shows that he would pose such a danger to others if armed because those activities could lead to violent confrontation"); *Williams*, 113 F.4th at 663 (holding that a person convicted of a crime is dangerous and can be disarmed if he has committed, among others, "a crime that inherently poses a significant threat of danger, including (but not limited to) drug trafficking and burglary"); *Williams*, 2025 WL 1341877 at *2 (holding that prior convictions for possession with intent to distribute cocaine and marijuana and child endangerment constitute a "dramatically different criminal record" than Bryan Range for purposes of Second Amendment analysis); *Mollett*, 2025 WL 564885 at *7 (holding that three prior convictions for drug trafficking less than two years prior to the Section 922(g)(1) offense support the conclusion that defendant presented a special danger of misusing firearms and was subject to disarmament). Defendant's other prior convictions–though not necessarily sufficient individually to establish the requisite

33

degree of dangerousness–when considered in combination with the drug trafficking and robbery convictions, demonstrate Harper's historical involvement in dangerous and recidivist criminal conduct.

Based on this comprehensive review of Harper's criminal record, it is clear that Harper presents a far greater risk of dangerousness than Bryan Range if permitted to be armed. Thus, based on the above analysis, the court concludes that Section 922(g)(1) is not unconstitutional as applied to Harper.

### CONCLUSION

For the reasons stated herein, the court will deny Harper's motion for reconsideration and motion to dismiss. The court will also deny the new motion to suppress but leave is granted to Harper to file another motion regarding the *Miranda* issue. An appropriate order will follow.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: May 5, 2026